14-2444 Partners in Forestry Cooperative et al. v. United States Forest Service et al. Arguments not to exceed 15 minutes per side. Ms. Dugan for the appellants. Good morning, Your Honors. May it please the Court, Mary Ann Dugan for the appellants in this case. I would like to reserve five minutes of my time if it works out that way. As you know, there are several issues on appeal. Unless the Court has other direction, I would like to focus on two issues. The issue of alternatives, the range of alternatives, and the issue of what deference is owed to the agency. Regarding the deference that's owed to the agency, in the Meister v. USDA about five years ago, this Court, and that's 623 F. 3rd at 363, this Court noted that an agency is not entitled to deference simply because it's an agency. It has to earn that deference. And in that case, this Court actually reversed the Forest Service for not following its own procedures in developing a forest plan because it did not adequately address the recreational issues, hunting and that sort of thing. Is this a Michigan case? It's a Michigan case. Judge Kethledge? Yes. Yes, Your Honor. And in particular, there's no deference due where an agency ignores its own experts. I can't find a case from the Sixth Circuit on that, but it's in several court decisions addressing the National Environmental Policy Act. For example, Defenders of Wildlife v. Babbitt, 958 F. Sup. 670 at 685, and that's from the District of D.C. from 1997, citing prior case law. And in that case, the Court said, although the Court must defer to an agency's expertise, it must do so only to the extent that the agency utilizes rather than ignores the analysis of its experts. And the government has a duty under NEPA to use high-quality information and accurate scientific analysis. That's 40 CFR 1500.1B. Here, the agency staff themselves expressed great concern over the condition of the private lands that are proposed to be exchanged, and I'll explain that. Doesn't that suggest, if they expressed that concern, that it was carefully looked at? Well, no, it does not, because that is buried in the record. It's in the appendix at 334 and at 169 and at 18 to 19, but it was not really addressed in the environmental analysis. In fact, the environmental analysis glosses over the vast difference in quality of the lands, and that goes to two different points in the brief in our arguments. One is… Now, the staff is your experts, right? That's correct. You're saying that they were ignored? That's correct. Under NEPA, all those citizens… I wanted to ask you, I recognize that your argument is that the Forest Service didn't give enough weight to the various considerations. I think you're going in this direction, but besides those concerns, can you point to a flaw in the methodology that the service used and tell us, is that some factor that we need to be considering? And maybe that's what you're getting ready to tell us right now, but what was the flaw in the methodology? Yes, Your Honor, thank you. And as you likely know from reviewing the NEPA case law, there cannot be a battle of experts. That's why citizens don't hire their own experts in NEPA cases. We must defer to the agency's methodologies and experts. But here, as in the Meister case and as in ONDA, Oregon National Desert Association versus Bureau of Land Management from the Ninth Circuit from 2010, you can't defer to a void where there is no methodology being presented. Here, there are two key procedural problems. One is the failure to address any alternatives to the land exchange that's been proposed. There's simply the action alternative and then the required no action alternative. The second procedural failing is the failure to prepare a full environmental impact statement as opposed to an environmental assessment and the unreasonable finding of no significant impact, which can only be found if there will not, certainly will not be significant impacts. There was a modification of the exchange, though, was there not? A slight modification of the exchange dropping the least, one would say, valuable parcels from the public portion of the exchange. As for the alternatives, the Council on Environmental Quality, which is the agency that is actually due deference here to its interpretation of NEPA, as the court noted in Grand Canyon Trust versus FAA, D.C. Circuit, from the D.C. Circuit, 2002. The CEQ in 40 CFR 1502.14 noted that the alternatives requirement is, quote, the heart of NEPA. Because NEPA has no substantive requirements, there's no, you know, it's called the National Environmental Policy Act. I know a lot of people have called it the National Environmental Protection Act, but that's not its name. It's actually simply an action-forcing procedural requirement, and that's why when a procedural part of NEPA is not addressed, there is a ‑‑ The idea of considering alternatives is just sort of a rubric to make sure the agency thinks about something carefully, right? Right. You can't just say, this is a good idea, and you say, well, why didn't you think about that? We didn't care because we wanted to go this way. That's kind of bullet‑headed and not what you want. You want them to think carefully. But here, they considered an alternative. Now you say, well, but they should have considered other alternatives. It sounds less like we're trying to get you to think about this carefully and more like we're wanting you to go through artificial hoops. Well, it's not artificial. Well, what I meant by that is they actually did think about whether this should be done as opposed to some other alternative. How many alternatives do they need? Well, they need more than one. Why do they need more than one? If the goal is to get them to think about it carefully, you get the most obvious alternative and say it's not as good as that one. It may be nice to come up with other alternatives, but you don't want to turn the requirement that they consider alternatives into a hook to overturn reasoned judgment. The reason that the alternatives requirement is at the heart of NEPA is because it's not just to present the preferred alternative and talk about its impacts. It's to compare the impacts of different alternatives. Here there is no alternative being presented other than this private party wishes these parcels to be exchanged, and the agency rejected all other alternatives because they weren't. What were the other alternatives? One alternative which was urged by the agency staff themselves, that's in the record at 786, 788, and 791, was to delete some of the parcels and not the ones that ended up being. But they deleted 80 acres, didn't they? They deleted the least environmentally significant 80 acres, yes. And is it not, I mean, they exchanged 240 acres for, originally 320 acres, they deleted 80 acres, now they're exchanging 240 acres for 421 acres, is that correct? That's correct, and the reason... Is the valuable part of that land the old growth? Well, the... Because they got more old growth than they gave up, right? No, no, no, there's a net loss of old growth, that's in the record. Sorry, at 260. Pardon? You say there's a net loss of old growth because a lot of the 400 plus acres was not old growth. In fact, it was entirely clear cut two years before the analysis was done, and the staff themselves said the recent clear cutting means that it would not support commercial timber for 40 years, the private land that's being gained. And recent clear cutting, quote, negatively affected the potential to manage the area for both timber and wildlife for many decades to come. That's in the record at 334 and 169. And the agency was also concerned that the public lands that are being traded to the private party would end up, they'll be developed into parcels, residential parcels, and they'll be damaged to perennial streams and fish, and that's in the record at 18 to 19. The agency staff, therefore, did urge a second alternative that would retain some of the public lands, and that was rejected. The federal lands, of course, include Wildcat Falls, which is addressed at length in the brief, and I don't know if the court had an opportunity to look at the photos, which also compare the condition of the lands, which are in the appendix at 347. 347.01 to 03 is the private lands, and 04 to 21 is the public lands. And I see that I'm just about out of time, so I'll reserve my time for rebuttal. Thank you very much. Thank you. Ms. Duggan. Good morning. May it please the court, my name is Tecla Hanson-Young, and I represent the Forest Service. The Ottawa National Forest was created in the 1930s out of the purchase of tax-delinquent lands, which means that the forest is about, within the boundaries, there's about 40% of privately owned land. Boundaries between forest and privately owned land are expensive and difficult to maintain, and so one of the forest plan's goals is to consolidate land within the forest to decrease those boundaries and make its management of the land more efficient. The Dulwich's proposed this land exchange, and the Forest Service realized that they could get a large parcel, 420 acres of land, that is completely surrounded by forest and state wilderness land, and in return they would convey several parcels that are all small, they're isolated from each other and other forest land, surrounded by private land, and they are difficult to manage. The forest thoroughly considered the impacts of the exchange, and we have detailed the consideration in our briefs, but I would like to make a few points to address my counsel's remarks. And I would like to start out by addressing her first point. Before you go there, let me just say I understand that the goal here is to consolidate forest service land. So is the Forest Service required to analyze any cost associated with the land exchange and any future management services, and is there a requirement that there be this environmental impact study or assessment? Can you address both of those things? And if you're going to do that as part of your answer, that's fine, I'll wait, but I do want you to address that. Well, the Forest Service evaluates the costs of the value of the land as part of the appraisal process and making sure that the value is roughly equal, the land to be acquired is roughly equal to the land to be exchanged. The Forest Service considers part of the cost as one of the goals of its forest plan, which is to increase its management efficiency of the forest. And as far as what is required under the National Environmental Policy Act, the Forest Service is only required to consider the likely environmental impacts of whatever project it's proposing. So here it's looking at the environmental impacts of conveying these federally owned parcels and the environmental impacts of acquiring the privately owned parcel. So some of the environmental impacts of, there's no direct environmental impacts other than the exchange of title, but there are indirect impacts. For example, the forest assumed that the deleges would log all or some of the parcels that were being exchanged. On three of the parcels, there were stands of trees which are classified as potential old growth. Now old growth doesn't refer to the age of a tree. It refers to characteristics of tree stands. For example, trees that are different sizes and are structurally complex and are connected to other trees are considered old growth. Here, the stands at issue that the plaintiffs are concerned with are potential old growth because they don't have all those characteristics. They're even-aged. They're not connected to other tree stands, so animals can't move through. They're not effective habitat. And there are only 61 acres on these three parcels. Now forest-wide, there's 58,000 acres of potential old growth, or classified old growth, which includes existing old growth that has all the characteristics and potential old growth. And the Forest Service can actually increase the number of potential old growth, its classification, on a site-specific basis. When it goes in and authorizes logging timber projects, for example, it can say, no, we need to increase our potential old growth. Let's designate this stand, and then we will designate it as off-limits to logging. So there's ways that the forest achieves its management objectives of increasing classified- Even with respect to land that's not its anymore? No. So that was one of the impacts that was considered, the conveyance of these parcels that include 61 acres of classified old growth. Now, while the conveyance would result in the loss of those acres, it would also result in a net gain, I believe, of cedar, 50 acres of cedar. There were only 14 acres on the conveyed parcels, and there would be a gain of 21 acres of hemlock, and those are two of the species that the plaintiffs have identified here as species they're concerned about. So on the whole, the service considered these various impacts, and contrary to counsel's point about the agency ignoring the opinion of its experts, the email referred to by counsel simply pointed out that the land had been recently logged and wanted to make sure that the agency considered that fact in the appraisal process with respect to the value, the monetary value of the land. The condition of the land was further documented at page 471 in the appendix, which was prepared a couple years later. They actually went out and looked at the land a couple years later, and they found that, in fact, aspen was regenerating on Parcel 8, which was the privately owned land, and also that the habitat is actually quite similar in Parcel 8 as it is in the parcels that would be conveyed. So really it's simply a matter of exchanging similar kinds of habitat for similar kinds. What about the waterfall? Well, the waterfall would admittedly be conveyed, and the Forest Service recognized that Wildcat Falls was significant for local residents. However, the Forest Service also recognized that there were 18 other waterfalls that were nearby within a two-hour drive. The falls are not unique in their form or their character. They have no historical significance. How does a waterfall get historical significance? There's a battle nearby or something? You know, somebody came through and camped there as they were discovering the Midwest, things like that. You know, there may be a structure. Elizabeth Clark slept here or something? Right, exactly, things like that. So there's no indication. While Wildcat Falls is significant for some, it's not unique under NEPA. Is it accessible? Well, it's conveniently accessible, but there's no marked trail going there, and the parcel, in fact, lacks legal access. So to get on it, you have to go through private land or roads. Or not roads, I'm sorry, that's what it lacks essentially. So it's not even the one. When looking at what was to be conveyed and comparing it with what was to be acquired, the Forest Service made its judgment, and there's no indication that that judgment was unreasonable. And not only that, the plaintiffs didn't forget about it. And the plaintiffs haven't challenged the substantive decision under the statute authorizing the land exchange, which is Section 1716, 42 U.S.C. 1716. They've only challenged the Forest Service's environmental analysis under NEPA, which is a procedural statute. And the plaintiffs haven't shown any evidence that the Forest Service failed to adequately take account of or consider. And as far as the alternatives analysis goes, the record shows that the agency did, in fact, consider four alternatives. Is there, just to back up a little, I'm not sure how relevant this is, is there kind of an ongoing program to purchase these things so that every year there's stuff being purchased? Or is this just sort of a happy thing that occurs every 10 or 20 years? There are about one to two proposals that are made to the Forest Service every year to exchange land. Nationwide or for this? For this forest. For this forest. Or for this region, I'm sorry. By region, you mean Michigan or? It's... Or you mean this forest? It's a little bit broader than this forest, but it's the forest within the area. I'm sorry. I don't know the exact... Is there typically a suit for one of these things, or is that unusual? It is. There are no other suits that I'm aware of that have been brought within the last few years. But I would also say, even though one or two land exchanges are proposed every year, they're not approved every year. I think one is approved every few years because the Forest Service doesn't determine that they're within the public interest. Would this be considered a large or a small? This is a small exchange. How many alternatives would the Forest Service usually look at for a small exchange? I mean, it would depend. The number of alternatives would depend on the project that was being proposed and the Forest Service's purpose and need. So for a land exchange project, I can't speak to what it would typically do, but what I can say that in this case, the number of alternatives considered in detail, which were two alternatives in detail, was reasonable, and two alternatives that were briefly considered but rejected, that was also a reasonable analysis as well because the Forest Service had to evaluate the proposal that was in front of it, which was a land exchange of Parcel 8 for Parcels 1 through 7. So its analysis is bounded by the proposal in front of it in the first instance. Anytime you have an exchange, you could presumably make a purchase and keep the stuff that you're exchanging. That's right, and the agency considered that as an alternative, but briefly. They just had a tough negotiator on the other side? Is that the reason that they didn't do that? I wasn't involved in the negotiations. That may be so, but what I understand from the record and what the record shows is that the Deliches would not sell Parcel 8. They wanted an exchange, and they also wanted Parcels 1 through 3. So the Forest Service couldn't remove Parcels 1 through 3 from the exchange, or the exchange would fail. So that's why those two alternatives were rejected from further analysis, and I would also add that the Forest Service, in fact, evaluated the impacts of retaining Parcels 1 through 3 and purchasing Parcel 8 indirectly through the more detailed analysis it did because it analyzed all the parcels on a parcel-by-parcel basis. So those alternatives are just simply shifting which parcels stay in federal ownership or not, and because those parcels were evaluated individually, one could understand what the impacts would be of retaining Parcels 1 through 3. Might they have just sold those parcels, or would that have been unreasonable? I'm not sure. That would have trimmed up their boundaries as well. That's correct. I'm not sure what the statutory authorization for sale of forest land would be or if there is. The statutory authorization? Right. The land exchange is specifically authorized by a statute. I'm not sure if the Forest Service has authority anymore to sell forest land, but I will say this. That might be a further argument against considering purchase because you don't have statutory authority to sell. Right. Maybe Congress wants you to increase area and not decrease it. That wasn't a reason that was given. The reasons given for not considering the purchase alternative in more detail were that the deleges wouldn't sell it, and secondly, there wasn't funding appropriated for it. So perhaps in a specific appropriation it would be for the purchase of land. No funding is probably more important because people will sell if you raise the price high enough, usually. Right. Maybe that's so, but the deleges did say that they wouldn't sell it. I would also direct this Court's attention to the Klein case. It provides a very useful discussion of the kinds of alternatives that an agency needs to consider, and in that case the agency only considered two alternatives as well. It was a proposal for a hardwood biofuel plant, and the Court there held that the agency didn't have to consider, for example, alternate fuel sources, sources from grasses or things like that, because that wasn't the project that was proposed for its consideration. My last point that I'd like to make is just briefly about the significance of the environmental impacts. The plaintiffs assert that an environmental impact statement, which is a more detailed assessment of environmental impacts, needed to be prepared because the waterfalls are unique, the old growth is unique as well, which we've talked about already. But they also say that there was public opposition to the project, and that meant the project was highly controversial. And then they also say that the impacts of logging were unknown. First of all, this Court in the Klein case also held that highly controversial doesn't mean public opposition. What it means is a dispute about the nature or the size or the effects of a project, and the plaintiffs haven't shown any kind of dispute about that here. Secondly, as to the impacts of logging, it was reasonable for the agency to rely on the fact that, first of all, the agency looked at the impacts of logging with and without the delegates using best management practices, which protect water quality, and still concluded there would be no significant impacts. But the Forest Service assumed that the delegates would use these best management practices because they had done so when they logged Parcel 8 in the past. And if they didn't do so and there were water quality impacts, they would be subject to enforcement actions. And also the steep slopes around the waterfall and the deed covenant restriction would also protect water quality and the waterfall's free-flowing condition so that it would continue to provide suitable habitat for wildlife in the area. Thank you. I see your time is up. Unless there are further questions, we'll hear rebuttal now. Thank you. Thank you, Your Honors. On the alternatives, I want to explain a couple of things. Number one, as far as I know, there is no current provision for selling outright Forest Service lands. What there is, however, is so there's the exchange provisions in the statutes, which allow for exchange if there's no more than 25 percent difference in appraised value. But the Forest Service can purchase properties through the Land and Conservation Water Fund. And in the Muckleshoot case out of the Ninth Circuit, which we addressed in the brief, the court had almost an identical situation here, which was that there was only the single alternative presented of the land exchange that was desired by the private party. And the court said, and this is in the brief at 27, the opening brief, that if the purpose of the project was narrowed down to just exchanging the property on those terms, that that was not permissible. And in this court, actually, with Judge Donald on the panel, Judge Griffin last August in a Coalition for Advancement of Regional Transportation, and I have the site somewhere, but the court said, typically a purpose is unreasonable when the agency defines it so narrowly as to allow only one alternative from among the environmentally benign ones in the agency's power, such that the EIS becomes essentially a foreordained formality. And the court cited Webster v. USDA out of the Fourth Circuit. That's an EIS, though, rather than an EA. Right, but as addressed in the brief at length, it's not the range of alternatives that is narrowed in an environmental assessment, but the depth of analysis. Here, where the agency rejected out of hand any alternative other than the one requested by the individual landowner. Now, remember, this individual landowner is not allowed to come to the Forest Service and say, I want to buy those pieces of property you have so I can log them and develop them. And so the private landowner sets up a request for a land exchange. So it's driven by the private landowner. The agency has to have a rationale that serves the public purpose. Here, the presented rationale was to consolidate lands. However, the agency, as in the Muckleshoot case, did not look at the reasonable alternative of obtaining lands that would help the Forest Service do that, or look at other private lands that are available for exchange and use that as a comparison. By obtaining, you mean purchasing. Purchasing with land and water, land and conservation water. Maybe the taxpayers would prefer exchanging to spending the money. As the Muckleshoot court explained, the land and water conservation fund is available only for such purchases. There's also the National Parks v. BLM case out of the United Circuit from 2010, which we addressed in the brief at 27 to 28. There, there were six alternatives to the land exchange, and even that was not sufficient because none of them were, there were other reasonable alternatives that would have helped the public purpose that were not addressed. The, as for the environmental impact statement requirements, the number of acres is not dispositive. Rather, the impacts are what is dispositive. Here, there is definitely more than just a public controversy saying we don't want, we don't like this land exchange. There is actually a controversy about the impact and the effect, which is the, what that, the controversy factor is intended to address. And that is on the part of both the citizens and the staff. On the one hand, you have an environmental assessment that is glossing over and downplaying the importance of Wildcat Falls and the other attributes of these lands. And then you have the agency staff going on at length to express their concerns, as I previously explained. The use of the best management project, sorry, best management practices, as I explained in the brief at 22 to 23, cannot be used to turn a significant project into an insignificant impact project because it is, those BMPs are not binding on the landowner. My opposing counsel stated that the landowner would have legal repercussions if there were water impacts from their activities. That is not the same as saying these BMPs, best management practices, are binding provisions of law. They are not. Once these private, or sorry, now public lands are privatized, so while they're in the public hands, there are provisions that protect them. Once they're privatized, they are not and they are going to be logged. I urge this court to reverse the district court and ask for remand to the agency to prepare an appropriate environmental impact statement or a more thorough EA. Thank you. Thank you very much. The case will be submitted. I think the remaining cases are on the briefs. You can adjourn the court.